Good morning, your honors. Todd Burns on behalf of Travis Job. My hope is to reserve two minutes for rebuttal. In light of the court's order indicating that the party should be prepared to discuss Utah v. Strife on the attenuation doctrine, I will start with the two searches that occurred on October 3rd, 2012. The first search was of Mr. Job when he was in the garage with the residents where officers had gone to serve an arrest warrant or at least look for a wanted person, not Mr. Job. The government, the attenuation doctrine certainly couldn't apply to the circumstances there. The government has argued that the pat down, as they characterized it, was permissible pursuant to Terry. There are a number of responses to that, but the most important one is this is a search, this is a seizure and a search in a home, so Terry doesn't apply. It's a bad search and seizure. The question then becomes, and I had argued in the opening brief, whether or not that paints the subsequent search of Mr. Job's car. The government as much as concedes that in their brief, what they argue is not that there was some sort of attenuation either. What they argued is that the initial search and seizure were okay under Terry, and they say assuming that the court agrees with that, then the subsequent, fruits of the subsequent search of the car are okay. I thought they also said, well, you know, he was under a Fourth Amendment search waiver. They do, but they don't. That's what sort of quote unquote is the basis for the attenuation. They didn't argue attenuation. Instead, they said that the first search is fine under Terry. It would be different if they'd said, okay, even if this first search is bad, it's attenuated because the officer discovered the search term. They didn't argue that, and the attenuation doctrine's been around for some time. They didn't argue it, so our first position is they waived it. The second position is if the court gets into that issue nonetheless, it creates a number of problems, the first one being factual, which is when did the officers discover the search term? Because if you read Officer Detenato's report, ER 56 to 57, it kind of bounces around. So if you read it purely chronologically, well, he discovered the search term before the car was searched, but it doesn't look like it's a purely chronological report, so you have that fact problem. You also have the problem of whether or not the search holding of this court's opinion in King can be extended to a misdemeanant who is on probation for a nonviolent offense. And the government says, well, they don't dispute that his offense is nonviolent. They say, oh, he's not a misdemeanant. He's a felon because if you look at California Penal Code Section 17B, it's a wobbler, and it's a felon. Well, 17B1 says if the person received a term of straight probation, it's a misdemeanant. Mr. Job received straight probation. So again, then you have the problem of are you going to extend King under those circumstances, which the government hasn't even argued for, so there's a second layer of waiver there. But even if the court did apply strife, it doesn't apply here. There are three prongs to the attenuation doctrine. The first is temporal proximity, just like in strife, there's no question that that issue or that prong weighs in favor of Mr. Job shortly after the initial violation. The second is flagrancy. In strife, they're dealing with a Terry type stop in which the court said, well, the officer could have just done sort of a walk up to and talk and probably not even implicated Terry. And as a matter of fact, in that case, the government was just conceding it was a Terry stop, and the court seemed to have some rest and search in a home. It couldn't really be much more flagrant unless they maybe beat him up on top of it, but that's not normally an issue for suppression. That's an issue for 1983. I'm going to interrupt this, but is the record clear on when the money was seized? Was the money seized at the time of the initial stop of the person, or was the money seized later while they were searching the car? It's not clear, and that's part of what I was saying about how the officer's report isn't clear, because he kind of jumps around. He says later he refers to the fact that a phone was seized on the body even after they searched the car, but presumably if he's patting him down, he'd take out the phone and check out what that was. So again, it's not clear when the money was seized. I would assume if it were a big wad of money that when he pats him down and he takes out the pipe, he'd take out the wad of money. But again, the things would logically progress. The third Stryfe factor relates to the intervening event, the nature of it. In Stryfe, what they said is, look, the intervening event is finding out that there was an arrest warrant. At that point, the police officer had to arrest the guy. He had no choice. It was ministerial. Here, the intervening event is discovering a search term. There's no indication the police officer had to do a probation search. As a matter of fact, it's somewhat questionable and this is left open in this court's opinion as it are, if the police officer is not doing a probation search that is directed at the purposes of probation and rehabilitation and that sort of thing, that you can after the fact justify it based on a probation search justification. So those are all sorts of problems with getting into applying Stryfe in this context. It doesn't apply anyway, even if you do apply it. So the search of the car is also tainted by the search warrant, which takes me to the December 5th, 2012 search of Jobs' home. And the government has argued two reasons why that search was permissible. The first one is they again rely on the probation search. They have the same problems there that they had with the search in the garage. One, there's no indication the searching officers knew that there was a search term. Why would they get the search warrant if they believed there was one? And the government says, oh, well, Officer Katie's affidavit in support of the search warrant mentions the search term. But what Officer Katie's affidavit actually says is that Job had in the past tense a search term in October of 2012. He doesn't say he has one now. So it indicates that he didn't know that there was a search term. Furthermore, Officer Katie's not there doing the search. Some other officers are and there's no indication that they knew that there was a search term. And the government says, well, Officer Katie knew and the collective knowledge doctrine, you can impute that knowledge to these other officers. Well, under the collective knowledge doctrine, if Officer Katie knew, which it's not established he did, you could impute it if these searching officers were in close communication, cooperation with Officer Katie. There's no indication on that either. So the probation search term just on those bases alone can't be relied on to support the search of the home. Of course, you also have the whole extension of King, extension of, you know, the whole Laura issue in that context as well. So that leads us to the search warrant. And the search warrant says nothing to indicate that there will be, to establish probable cause, that is a fair probability that there will be fruits of methamphetamine trafficking found in Mr. Job's home. And the government, their only answer to that is to rely on Fernandez in which they say, well, for drug dealers, if you establish probable cause there's a drug dealer, there's a fair inference that there will be evidence of drug dealing in their home. But Officer Katie's affidavit didn't establish that Job was a drug dealer or a fair probability that Job was a drug dealer or probable cause that Job was a drug dealer. Even taking it in the best light to the government, that is, you know, not discrediting his conclusory allegations about everyone's role and crediting his editorializing about what certain things mean which are based on his conclusory allegations. What he said was that Job was engaged in cutting methamphetamine for Kerry Brown Rodriguez and Robert Rodriguez for a short period of time, that is approximately August 28th to September 3rd of 2012, that is three months earlier, and that that activity had ended. So he's not saying he's a drug dealer, he's saying he had a very specific activity he was engaged in for a short period of time, and there's nothing to support that that type of activity would lead to finding evidence of drug trafficking in his home. Well, are you arguing in this court or not, staleness? In other words, even assuming that there were evidence that he's a drug dealer and even assuming that drug dealers often keep drugs in their homes, why should, why does it support a search, why does the evidence that sort of ended in September or October support a search of the home in December? I am arguing staleness, and what you'll find is that the heading of the motion that was filed by defense counsel in the district court said staleness, but his argument was more than just staleness. He relied on Illinois versus Gates, and he said, look, there's nothing in this warrant application that says why evidence of, even if he was involved in cutting methamphetamine, evidence relating to drug trafficking would be found in his home. So it's staleness that it's old information, but it's also that the information does not point to a fair probability that there will be evidence found in Mr. Job's home, because there is no specific evidence pointing to the home. Nothing points to the home. It points to a limited period of activity that is in no way tied to his home, which leads then if that evidence is ordered suppressed from those two searches to the government's harmless error arguments, and the government doesn't acknowledge it, but it's harmless error beyond a reasonable doubt, which means that the evidence might have contributed to the verdict. And common sense indicates that evidence related to October 3rd and December 5th, which the brief was indicative of Mr. Job being involved in drug trafficking. Common sense indicates that that sort of evidence might well have impacted the jury's decision to convict on a conspiracy charge that encompasses that same time period, and on the possession with intent to distribute charge on December 5th, 2012. And as a matter of fact, government focused on if the search was okay on December 5th, then what? If the court finds that the search was lawful on December 5th, well, nonetheless, actually, what the government, in its closing argument, more focused on was what was found on October 3rd, 2012. They said, look, he's out there walking around with this money in his pocket. He's got the same kind of baggies that we found in his home. This is indicative of the fact that he is a drug distributor, and obviously that supports that he is part of Rodriguez's drug conspiracy. And the references in closing argument to this evidence, the focused references are at 560M and 560DD of the excerpt of record. And the government's harmless error argument, and it does sort of a global argument with respect to both searches rather than breaking them out, and their argument on count one is, well, look, Harry Brown Rodriguez testified to X, Y, and Z, which put Job in the conspiracy. And that is the bulk of their argument. It's at their brief on pages 30 to 34. But the interesting thing about Harry Brown Rodriguez is, of course, number one, she's testifying with liberty dangling in front of her, with the cooperation agreement, and this court's case law is clear that that takes a substantial amount away from the weight of her testimony. But the even more interesting thing is when she's being questioned by the prosecutor on direct, he says to her, and this is at 173 to 174 of the excerpt, who are the people who are part of this distribution ring that your husband was running? She names people. She doesn't name Job. Probably disappointed in that, the prosecutor comes back to it a few pages later at 178, asks the same question. She names several people. She doesn't name Job. Then at 203 to 204, the prosecutor comes back to the same question and, you know, is probably trying to lead her along to a better answer and says, well, did Job ever get methamphetamine from your husband fronted to sell to other people and then bring back the money? That's the nature of the conspiracy they've charged here. She says, I don't know. She twice says, doesn't name him as part of the conspiracy, and then when the prosecutor tries to lead her to do that, she says, I don't know, because she doesn't have any indication he's a part of the conspiracy, because he's not. And she is her husband's chief lieutenant at that period of time. The government's argument with respect to harmless error on count five was that, well, and this is the search of the house related to December 5, 2012 as well, there was a lot of stuff in the house that indicated that the 56 grams found there was indicative of distribution. A lot of stuff was that there are some scales and there's some packaging. On the other side of that balance, there's plenty of evidence that Mr. Job is a methamphetamine addict. There are pipes with burnt methamphetamine residue in the house. There are little stashes of methamphetamine all around the house. There's no, there are no payo sheets. There are no firearms. There's no cash in the house. And the methamphetamine found is not packaged for distribution, and it's not cut. And one of the government says, well, you know, if you cut it, that's for distribution. This methamphetamine is not cut. All indications, or the strongest indications are it's for personal use. Nevertheless, it's at least a question that's up in the air, and could the evidence that the wrongfully seized evidence have affected the verdict? Might it have contributed to the verdict? On the beyond a reasonable doubt standard, I think absolutely. Of course it could have. And I just want to say before I sit down, lest Mr. Job not prevail on the counts that attack the convictions, at least, I believe all the sentencing claims are strong, but at least the third one, the government as much as acknowledges error, that is the unlawful discharge, plus two. What it says is that that was appropriately imposed, or that's the standard. Even if it took off those two points, he'd go from offense level 40 to 38, and at level 5, he'd still be at 360 to life. But it was three weeks from when the guidelines were adjusted downwards two levels when the district court imposed sentencing. It said rather than coming back here later based on the new guidelines, I can take that into account now. Do you want me to do that? Judge counsel said yes. The district court took it into account. Said, well, it's still the same guideline range, so it doesn't affect me. But if you also took off those two points for unlawful discharge, you're at 292 to 365, and it certainly does make a difference. So I'm sorry. Okay. All right. Thank you. Good morning. May it please the Court? Mark Rahy for the United States. Your Honor, there were no Fourth Amendment violations in this case. Well, how do you justify the search at the house? I mean, at the garage of this person? In the following way, Your Honor. There's no dispute in the record that these officers had an arrest warrant to be at 2504. They were looking for somebody else, correct? Correct. And under Maryland v. Bowie, when officers served the, or even before that, I cite a case from this court, United States v. Gooch, that says when officers have a valid arrest warrant, it entitles them to be on the premises. If the curtilage of the garage is part of the premises, under that warrant, they have a lawful right to be there. And I think maybe some of the confusion, you know, I use the word Terry when I was in law school. Of course, Terry usually stands for the idea of a reasonable suspicion detention. I also feel like it stands for just as much the idea of the pat-down for officer safety. I'm not saying that this search was justified as a detention. You'll never see that argument in my brief. What I'm saying is these officers, armed with an arrest warrant, under Black Letter 9th Circuit law, they have a right to be there. Now what happens when they get there? As soon as they get there, the garage goes up. The evidence is that these two individuals who are not the person they're looking for, who is Richard Elliott, appear very surprised. Again, under Maryland v. Bowie, this idea, when you have an arrest warrant, whether it's a search warrant or an arrest warrant, they have a right to take a protective sweep of the premises. Here, they're not even looking in empty rooms, opening closets, going into bedrooms. This garage opens up, and so what happens? Detonato, you know, in his police report says they look very surprised. Specifically says that Mr. Job looked very nervous. He had baggy clothes. He had a lot of items in his pants that the officer could not immediately discern. So he said, for officer safety, I thought I would do a pat-down. And then when you get to the pat-down, the scope of it was limited. He handcuffed him before he patted him down, right? He did, exactly, which may not happen all the time, but again, I would suggest that in Maryland v. Bowie, the Supreme Court says it's one thing to have an on-the-stop, on-the-street encounter. When you're in a home, you're in the adversary's turf. There's more chance of ambush, I would submit, especially in this day and age. These officers, I mean, he briefly handcuffs them. He doesn't delay. He doesn't sit him down and then come back to him 10, 15 minutes later. He immediately pats him down, and under Minnesota v. Dickerson, the Plain Heel Doctrine, his testimony at trial then was that he immediately felt the outline of the glass pipe, which was probable cause to arrest for possession of drug paraphernalia. Now, if we come to that point, Your Honor, the government's not disputing that by that time, but there was no knowledge of the fourth waiver. But if you read Officer Dedanato's report, the most natural reading of it is that once he was arrested, we ran a records check, and that's an excerpt of Record 56, which reveals he was currently on the fourth waiver. Now, what the government would then submit, I know we made alternative arguments for the search of the vehicle. The one I want to press today is the fourth waiver. Could you tell us what you know? Does the record show when the money was seized? Was it at the time of the original pat-down at the same time they got the glassine pipe, or was it the car? I mean, it's my understanding that it was on the person because it was a search incident to arrest. But, you know, he found the pipe, he felt that right away, and then the record indicates that he was arrested. So I think it's at least a fair inference. But I agree, it doesn't have the utmost clarity. But I would still submit, you know, as long as the search, even if one assumes that it was in the vehicle, the record for that is strong, and that brings me to the fourth waiver. Now, at the time I wrote this brief, you might… When you said they ran a records check, what did you say, how did you call it, they ran a what? It says on Excerpt of Record 56, we conducted a records check on job, which revealed he was currently on probation with the fourth amendment waiver. So I'm assuming, you know, if you dispatch, I mean… So did that provide the terms of the waiver or nothing? No, nothing, not the exact terms, Your Honor, I would agree. But I would submit that that is the most prevalent term, and it does, you know, that is in fact the waiver that he had, but… So it's your position that before they opened the car door, that they knew about the fourth waiver? Yes, it is, Your Honor. Was there a finding by the district court to that effect? Not as far as breaking it down by chronology, no. Did the district court make any findings here? I believe he found that, you know, he heard the argument from the parties and then found that it was a probation search. Because I believe even the defense counsel below, Mr. Grothrie, did not… You know, he found it as a probation search of the car or of the person as well. I believe all of it. In the district court's view, the fact that he was on probation, had a Fourth Amendment waiver, that justified everything? Correct. And, you know, I understand, I know my opponent accused me of waiver, this, that, and the other thing. I mean, look, this court can affirm on any grounds supported by the record. And what our position is is that there are enough grounds. And even if one turns to the fourth waiver issue, you know, this can be an interesting, this is a very interesting issue of law. When I wrote my brief, the only case from this circuit was United States v. King. And it had this holding about a violent felon. It said, we don't purport to define the outer scapes of a permissible fourth waiver search, but we do know this. A violent felon, then it's okay. And that person was, you know, convicted of domestic violence. So at the time, a lot of, you know, I had another one of these cases that I argued in March. Down in the Southern District, at least, a lot of times you'd argue, well, is it a felony or not? That's why you have this briefing in our papers. And I'll stand by that briefing. Just because somebody gets a term of probation, the way it was suspended, you know, imposition of a sentence was suspended. Under the law, I still believe that's a felony. But now I will tell you, in a case since I wrote my brief, there's a case that my opponent cited. It's the United States v. Lara. It doesn't, it indicates that that's not even determinative. When you talk about the reasonableness of a fourth waiver search, it specifically says where King does not control, i.e., where you don't have the very discrete circumstances of King, we go to balancing, which is a fundamental thing when one talks about reasonableness. You balance the degree of the intrusion, whether the search waiver is explicit, this kind of a thing. And here we would say that a vehicle, even without a fourth waiver search, has long been held to have already reduced expectation of privacy because of all the regulations that vehicles are subjected to. But here as well, I mean, a vehicle waiver search is one of the most common. You look at Lara, it was about a cell phone. Then there's the whole dispute about, well, is that property or not? I mean, this is a tangible, fungible item. So the government's position is that those two searches are valid on October 3rd. But if the first search on October 3rd is not valid, if the search of the person were not valid for some reason, is your only justification then for the automobile search the search waiver? Well, I made an alternative that there would be probable cause. But I guess if you exclude those fruits, then yes, I would be limited to the fourth waiver. But then as far as the House is concerned, I mean, by this point, there is no question that the officers knew. Now, my opponent tries to split hair as he looks at the affidavit. The affidavit for the search warrant is referring in a historical sense to all the events that happened. When it says that he had a fourth waiver, it's a fair inference that that's the affiant. I don't believe that this court has a view of the law that in order for a fourth waiver search to be valid, when the swearing officer who actually gets the search warrant has to go and literally tell the officers who conduct that search, that's a ministerial function at that point for those officers when they're armed with a warrant. But even aside from the fourth waiver, I mean, I know my opponent attacks the probable cause showing. He relies heavily on the Underwood case. I reviewed that again a few days ago. I mean, when you compare the facts, it's not even close. When you look at this, I mean, in Underwood, Judge Ferguson wrote an opinion. He said there were only two facts in the warrant in that case, and that was an ecstasy trafficking. He said one of them was that there was a personal use of marijuana found. That showed nothing. And the other thing was that the affiant who wrote that affidavit was two levels removed, wasn't there. There was apparently a transfer of crates that happened, and Judge Ferguson said that's all, you know, all you have. That's not enough. I would submit to you, if you review this warrant, affidavit again, and it's excerpt of records 63 to 97, if you get a highlighter and highlight the name Job, you will see it 30, 40, 50 times. There are a plethora of facts there. And how many of you put the search waiver, even if you excise that from the affidavit, you did more than enough? Correct. And that's only, I believe that was in one paragraph, paragraph 17. One thing that I never hear, and I'm looking forward to hearing on reply, what about all those events from August 31 to September 3 where you have Carrie Brown Rodriguez, while Robert Rodriguez was in jail, communicating directly and repeatedly with Travis Job about cutting methamphetamine. And I know my opponent got up, he said, oh, Carrie Brown Rodriguez, she was the state's witness. It's true. And even after a lot of cross-examination, they never really poked any holes in her story. But set that aside, as the prosecutor argued even in closing, there were the phone calls. They had wiretap phone calls between her and Travis Job. They had repeated text messages where she's all, you know, he says, I've got four, I've got a package of toothpaste coming. And then it turns out she testified that that contained the methamphetamine. It was three-quarters of a pound. She needed another four ounces to send out. So where's the other four? And he says, well, you know, I'm freezing, I'm burning it off, I can't rush this process. And then there's an idea that says. This is all in August and September. Correct. And so regardless of what she said or didn't say at trial, all these wiretapped phone calls were introduced in evidence. Correct. But even, you know, the reason I'm talking about them now in the context of this Fourth Amendment claim is that they are all, all of the substances set forth in the search warrant affidavit. So this isn't just speculation. You know, this is actual evidence. And they even had surveilling officers. There was a rendezvous in a TGIF parking lot. They see Travis Job meet with Carrie Brown Rodriguez after this flurry of text messages and phone calls. They were all reasonably interpreted as trafficking in methamphetamine. So that, I mean, again, I would say to the extent there's attack on a warrant, and as this court knows, there's great deference when reviewing a search warrant. There is not a high level of strict technicality that's subjected when one reviews the sufficiency of an affidavit. So we would say that that December 5th search stands on that. Now, aside from all that, we have harmless error. And the harmless error in this case, there are two counts of conviction, and I hope I can make this point as well before I sit down. That first count is just conspiracy to distribute. As this court knows, there are minimum elements that are required. You just need an agreement to violate the drug laws. You don't even need an overt act. I would submit to this court respectfully, these searches, he's talking about the October 3rd, December 5th. A full month before this, at the end of August, again, this evidence, from August 31 to about September 3rd, you have phone calls, text messages, and confirmed surveillance of Kerry Brown Rodriguez, meaning the church. So that proved guilt beyond a reasonable doubt in spades. And I know my opponent says, well, this is my favorite line. It makes sense. It's natural to believe that what happens in August is affected by what happens in October and December. I would respectfully disagree with that. This jury, I mean, this was a five-day trial. The search on October 3rd was two witnesses. They were over in what appears to be 20, maybe 15 minutes at most from the record. The overwhelming majority of the evidence at trial was something else, and it was strongly the Kerry Brown Rodriguez testimony, which, again, as the prosecutor told the jury, don't take my word, don't take her word. Yeah, she's cooperating. She's looking at some time off. But look at all this corroborating evidence. So the conspiracy count the government would submit is nowhere even near affected by this. Oh, I threw some on the minute 50. Talk about count five. Yes, possession with intent. Now, there was, I believe, three or four pages of closing argument. And, yes, at one point the prosecutor said, when you look at that section of the closing argument, there was another conspirator named Brad Wollard, I believe, and he had been doing a lot of distribution. The prosecutor goes through and makes point after point after point about how Travis' job is really no different than Brad Wollard. Then he says, after three or four of those paragraphs, he gets to the point where he says, and you know what, when you look at those baggies, those are the same baggies that he was found with on October 3rd. So, yes, the prosecutor mentions that. But what the government would submit is, again, just because that's mentioned once in closing argument, yeah, it may not be good for my case, but what's the law? The jury's instructed that the statements of the counsel are not evidence. And, in fact, when I reread the transcript, at one point the prosecutor said, there's no question of the following proposition. Judge Benitez immediately, suespano, told the jury, ladies and gentlemen, I know the prosecutor just said there's no question, but you are here to decide the evidence and what the statements of counsel are not evidence. Now, aside from that, when you look, that count five, Judge Benjamin, this is only charging the 56 grams found that day. So, again, what happens in October, I would suggest, you know, that was only three and a half grams. That doesn't prove that count five. And on top of it, when you look at what the officers found, they found five scales, some of them with false bottoms. They found myriad baggies. Detective Delgadillo, the defense's own expert, testified, where I see scales and plentiful packaging material, that's indicative of sales, not possession. In addition to that, you have Kerry Brown's, Kerry Brown Rodriguez's testimony and her interactions with Travis Jones, that he was the cutter of the methamphetamine. Well, that goes to count one, though, right? Well, that's also, that's conspiracy. But I would say, and this is another point, I only have nine minutes. Go ahead, just answer. Thank you. Cutting is still distribution. I think this is something. My opponent says, oh, when they asked Kerry Rodriguez, did you ever see Travis' job distribute drugs? There was one meeting. I would say, just for sake of argument, you can forget that evidence. If the only evidence in front of you was that somebody is the cutter of methamphetamine, that is still part and parcel of distribution. I cited Eighth Circuit cases that say that, and it makes sense. The whole point of cutting is to dilute drugs so that you can sell more of it. And I believe the Eighth Circuit has even said that that's why some people can be convicted of conspiracy to distribute strictly for buying cutting agents. And even if it was just for a 10-day or small period, that's all that's required under the law. We don't have to prove that he cut every single day. Kerry Rodriguez said her husband did the cutting originally, but then after August 2012, they hired Travis' job. Let me ask one question on sentencing. Yes. Do you agree with Mr. Burns' statement that you've just about given up on the toxic discharge enhancement? No, I don't, Your Honor. And honestly, I don't. I'm just not getting his argument about this minus two. I do agree that the district court maybe didn't make the sufficient record, but I believe it was undisputed. And remember, this is just by preponderance. They had acetone there. They had, I believe, glycerol. Under the CFRs, those are hazardous waste subject to the RCRA. So it doesn't have to be discharged. I know that's what the judge said. It can simply be storage. There are pictures in the record of these materials. And, in fact, if you use them … Are all those materials utilized in manufacturing meth? They are. I mean, they can be. And they certainly, and I would submit, Your Honor, more likely than not, here you have evidence. You've got the hot plate. You've got the kitchen with no food, no utensils. And Kerry Brown-Rodriguez's testimony that, yes, Your Honor, I would still submit that for that purpose, the plus two, he has those hazardous waste. What about the other sentencing issues that were raised? The first one, importation. I don't believe there should be any question there. This court, I believe it was Judge Callahan. It was a case called Bao Huang. I can't pronounce it right. It came out maybe a year or two ago. It said to get that plus two, you don't even have to be personally involved. Now, that case left open the issue whether you needed to know about it. So, obviously, they didn't reach that. But a few points, and I'll make them quick. One, the circuit in the surface case is found to be strict liability. When one looks to the 2D1.12 guideline, there are subsections or enhancements that use the word knowingly and then ones that don't. This is one that doesn't. Did Judge Benitez make any findings about whether he knew it had been imported? I don't believe so. Isn't that a clear violation of Rule 32 of the Federal Rules of Criminal Procedure? Rule 32 of the Federal Rules of Criminal Procedure says that any time there's an objection to something in the pre-sentence report and it's disputed, the judge must rule on the dispute and rule on it and make findings. And in any event, any upward adjustment burdens on the government to prove by preponderance of the evidence. Now, it may be that there is evidence to support one or two or maybe even all three of these upward adjustments somewhere in the trial record. But the district judge made no findings whatsoever. Unfortunately, I don't have his exact language in mind, but I would respectfully submit, Your Honor, that that first one should be the least controversial. It's a matter of law for the most part. That's what Val Haines says. As long as it actually involves importation, their objection, in fact, I believe in the record below, Mr. Guthrie was the defense counsel. There's a quote he said, there's no question there was importation here. You had evidence that they were importing from Rene. Again, this is a very plainly, simply written enhancement. It says, if the offense actually involved methamphetamine. It doesn't use the word knowingly, whereas other provisions do. In United States v. Lavender, this court says, as a default, we don't imply mens rea into enhancements. So I would submit, with that being the law, Your Honor, even if the defense says we have... I think the first one is a real problem because that's one of the ones where it appears the judge sort of made a finding and it's a factually incorrect finding. He said, there's no question the job was involved in the importation of methamphetamine, and he wasn't. Well, if that's what he said, I agree, Your Honor. But then I would still submit, if it's an issue of law. I mean, if the judge said, you know, the sky is green, it would still... If the law is that you only need to be actually involved without knowing. Okay. Thank you. I'll give you a minute or so for rebuttal. With respect to importation, the government relied on vicarious liability. That requires that the importation be within the scope of the agreement the job entered into. There's no evidence with respect to that. As a matter of fact, it wasn't charged in count two, which deals with the conspiracy to import. You say the scope of the agreement. Is that the same as the scope of the conspiracy? No, because the application of the guidelines made clear that there may be an overwhelmingly huge conspiracy charge, but yet that the vicarious liability under the guidelines might be narrowed. With respect to the discharge, it's unlawful discharge in application note 18 says that's in reference to four federal statutes. That's undoubtedly to give direction as to what unlawful is, and to, you know, sort of cabin so that this isn't applied differently in different states based on different laws. There's no indication that it was unlawful, any of those four statutes. The government doesn't even argue that. With respect to the search of the garage, the government's now relying on Maryland versus Buie. That's a protective search case, a protective sweep case. They never argued that before. There are a whole bunch of factors that they can't meet with respect to that, not least of which a protective sweep has to be a cursory search for dangerous people that might be on the premises. I don't think the government could argue that there might have been a dangerous person in Mr. Jobs' pants. I have several other things to say, but I'm out of time. Quick. The other thing, the government talking about the December 3rd search is kind of bouncing back and forth between harmless error and what's in the warrant. What was in the warrant does not focus at all on why there would be any reason to believe that there would be evidence of the methamphetamine offense found at Mr. Jobs' home. That's why the government has to fall back on Fernandez and say, well, because he's a drug dealer, it's a fair inference. But the evidence wasn't that he was a drug dealer. It's a pretty bad affidavit because it was so conclusory in setting out these things at the beginning to then state the conclusions with respect to the specific calls. But nonetheless, there's nothing indicating he's a drug dealer. Just that he cut methamphetamine during this limited period of time. And not cutting methamphetamine during that limited period of time. Could that be a conspiracy? Well, it probably could question whether or not you're giving up your possessory interest in the property as I raised in the methamphetamine. But nonetheless, that's not the conspiracy that was charged in this case. The conspiracy that was charged in this case was a very broad conspiracy. And that benefited the government immensely at trial because it could get into all sorts of things that if it charged more narrow, cutting conspiracy, it couldn't have gotten into. Cutting is part of the larger conspiracy, isn't it? That's something that is done in a conspiracy to distribute drugs. But only if Mr. Job was aware of the larger conspiracy, which the government defined at trial as Rodriguez fronting the drugs to people so they would sell them and bring them back to him. If Job wasn't aware of that, much less if he didn't agree to it, which he has to agree to it, then he's not part of that larger conspiracy. Thank you very much. Can I ask one more question? Yes. I want you to comment on this. It may be a fine comment by the district court. It's on 645. Judge Benitez says, I have no problem with the fact that there was an unlawful discharge of a toxic substance unless we're prepared to assume that methamphetamine is not a toxic substance. But based upon what I heard, I have no doubt that the assessment or that the adjustment applies. Now, isn't that a finding that there was a toxic discharge? Well, there's no finding that's unlawful. Whether or not you conclude that methamphetamine is toxic. Well, he said, I have no problem with the fact that there was an unlawful discharge of a toxic substance. And he said that methamphetamine itself. But the unlawful requires that you find that it's a violation of one of four federal statutes. He didn't make that finding. The government doesn't even argue. He didn't say it, for instance, under the RCRA or something like that. Because otherwise you could have, I mean, what does unlawful mean? It could be under so many state regulations, et cetera. That's why it's confined to lead to some uniformity. Confined by this guideline section itself? Application note 18. Okay. Thank you. Thank you. All right. I think Bruce Rodriguez is up next. Good morning, Your Honor. Your Honor, it's Jack Baltax on behalf of Robert Rodriguez. May it please the Court. Your Honor, one of the things I didn't have an opportunity to address in my moving papers was the prosecution in their response to pleadings indicated that there was an issue of harmless error. And I want to indicate to the Court in terms of what happens if you eliminate the 15 phone calls that we contend were not properly wiretapped because of necessity and because of the failure to give a complete statement of facts. First of all, you have, according to the prosecutor, the issue of the June 22nd and June 27th purchases of methamphetamine. And he says, well, you've got those, so that's indicative of evidence that should support the conviction for count three. I would contend that it would not be more likely than not that such a conviction would occur because what you're left with is, number one, the transaction with a confidential source, number one, that occurred on both those occasions. And if you look at that transaction, what you have is, number one, a confidential source who is eventually found out to be participating in unsanctioned conduct, criminal conduct, during the course of his involvement in this investigation. The second thing that you need to consider in terms of what's going on is that the officer did not see an actual meeting between the confidential source and Mr. Rodriguez. What happens is the officer says, I took photographs of what I observed, and when you look at the photographs, the only photograph that you have, you have no photographs of the confidential source, You have no photographs of the confidential source with my client, and you have no photographs of my client, Mr. Rodriguez. As a matter of fact, what you have is a photograph of an unidentified person in the car that allegedly delivered the methamphetamine. There is no physical evidence tying my client to the methamphetamine that was delivered either, either in the form of fingerprints or DNA. So I don't think that it's a fait accompli that he would be convicted of that count. Now, the prosecutor then says, well, you've got Kerry Rodriguez. Well, Kerry Rodriguez is very questionable in terms of her credibility. Number one, she's an accomplice. That doesn't matter, does it, for the purposes of why we do what we do? Well, I think in terms of delineating whether or not there would be more likely than not that a conviction would occur, I think the issue of her credibility comes into question because you're looking back at it and saying, Is that the test, whether or not the conviction would more likely occur? I believe that's the test. Give me a case for that. I believe the prosecutor cited it in their moving papers. If I could have a moment, Your Honor. It's U.S. v. Chu Tong Yin, 935, 2nd 999-94. And that's on page 36 of the Government Supply Act. In addition, you have to look at what Kerry Rodriguez did during her testimony. She lied about the involvement of Travis Jabez, if you believe that Jabez was involved. She lied about her own involvement in the conspiracy because she was looking at safety valves and to sit there and indicate she's involved in several drug transactions in which she's profiting impacts her because she's arranging for drugs to be sent to cross-country. She's taking money from people like Lizzie Sanchez in payment for drugs. She has her own clientele, which she admits she's making $300 per sale profit when she sells them methamphetamine. And yet, she is basically told the probation officer, I'm not involved. And basically, she says she wasn't financially benefiting when, in fact, she admits that she used the money to pay her bills and to support herself. And so, you have issues involved. She denied, for example, that she facilitated the importation of methamphetamine from Mexico. And yet, under penalty of perjury in her plea agreement, she makes that very admission. So, her credibility is severely suspect here. Her motivation is severely suspect here. She, for example, failed to tell the government about Rebecca Santoyo, who was accepting deliveries of methamphetamine from Mexico. Which of the issues in appeal is this argument relevant to? I thought we were here mostly talking about the motion to suppress wiretap evidence, whether the judge applied the right standard or not, whether the judge abused his discretion, whether necessity was shown under the wiretap law, and some sentencing issues. Those are the issues, Your Honor, but the prosecutor raised the issues in his answering brief that even if these calls were to be kept out, that it would be harmless error. And that's why I'm arguing it, because I didn't sufficiently go into the detail that I wanted to go into in my second brief. In your reply brief, yes. What's that? In your reply brief. In my reply brief, yes. Moving along, I just wanted to comment on some of the aspects about the necessity issue. One of the things that arose in my brief and the government acknowledged was that Mr. Rodriguez had a search waiver. And what is interesting is that the prosecutor raises the King case about suspicious searches and said, well, they couldn't have searched him or his telephone or his home or his car anyway because of the King case. Well, first of all, the King case came out on August the 12th, and this case began, at least with my client, sometime in June. And so it was before the King case. And secondly, the prosecutor and I conceded that probable cause existed for the wiretaps because there was evidence, according to the officer who wrote the affidavit, that Mr. Rodriguez was involved in the crime. Remember, King doesn't require that there be probable cause. It requires that the search not be suspicious. So the officers could have had his probation officer search him or his home or his vehicle or his phone because of the conditions when he was released. Did that just tip off everybody, what was going on? No, because a probation search wouldn't tip off anybody. That's normal in the course when the probation officer is attempting to get the defendant to make sure that he's complying. So what would be the benefit of doing a, like on the street, a probation search on the street? It may not benefit unless he actually possessed drugs, but the benefit of going into his house, contrary to what Officer McKean said in the declaration, was this. McKean indicated in the declaration that they rarely find search warrant evidence of the distribution network or who else is involved, et cetera, when they search the residences of people like Mr. Rodriguez. And yet, what did they do on September 16th, the night he was arrested? They went in and they did a probation search. And what did they discover? Pay and owe sheets and notations regarding the other people who had been fronted methamphetamine from my client. So they didn't utilize a device that they could have utilized, and their excuse to me is not credible as to why they didn't do that. Did they know about it when they submitted the affidavit? Yes, and I think the prosecutor acknowledges that they knew about it. And they had to know about it because they knew who he was and they knew what he had done. Do we know what the terms of the search waiver were? Well, I do, but unfortunately they didn't come in. I can only tell the court that he's on state. He wasn't on state probation per se. What happened is under the realignment, they made parole into community supervision, which is the same as state probation because state probation runs it. The condition that I've always seen and never have seen anything but County probation. County probation, I'm sorry. The provision that I've seen in every state case that I've handled, and I've handled hundreds with search conditions, is that the defendant is subject to a person, place, residence, or any devices he has to search and seizure at any time of the day or night. And that is the typical condition. And so I acknowledge to the court that that was not delineated during the hearing on this case, but that is my usual experience. Wasn't the purpose of the wiretap much broader than just Mr. Rodriguez? Yes, but it was, and you have to understand that. How would searching, how would, you know, invoking the search waiver further the overall? Well, because what you look at, in my viewpoint, is you're restricted to looking at, you have several people with several different paths that are being investigated here. You look at the information as to Mr. Rodriguez. He was a separate target. And you don't take what everybody was doing, because there's no evidence that he was involved with Fabian Valencia or that he was involved with George Garibay or that he was involved with Lydia Lucio. They're investigating him for a certain specific thing involving MA and the Mexican Mafia and drug distribution in and outside of the jails. And there's an overlap because Mexican Mafia collects taxes on these types of things, either on the street or in the jail. So the focus necessarily needs to be on the techniques that were used vis-à-vis Mr. Rodriguez. And others. And others. They want to know who else was involved. Right. And in the short period of time that they looked, they found out quite a number of people were involved As a matter of fact, their investigation uncovered 1, 2, 3, 4, 5, 6, 7, 8, 15, 16, 17 people. As part of the wiretap or as part of before the wiretap? After the wiretap. And after the utilization of the search. Not after the wiretap, excuse me. Before the wiretap, but using traditional investigative techniques. Some of the people were prosecuted in this case. I know at least one was prosecuted in another case. That was George Molina, who received, I think, 10 years in 13 CR 1240L, which would be Judge Lorenz. So you have to look at it from the perspective of what was going on with Mr. Rodriguez. And if you want to look at the whole perspective, there was a lot that was uncovered here through the utilization of traditional techniques. You have, for example, just in the situation of CS1, the agent says, well, you can't use a confidential source for the purpose of getting information about what's going on with the collection of taxes and the infrastructure of what's going on with the Mexican mafia in terms of collection of taxes and distribution of drugs. Yet CS1 gets all kinds of information from George Garibay about who's in charge. He gets information about Cynthia Martinez, who's dealing heroin. He gets information about Leonard Delgado. He gets information about who worked for Delgado. He gets information about Diego Ortega and that Garibay, excuse me, that Molina eventually took over Diego Ortega's collection in the jail. The CS was productive in terms of his situation with my client. He allegedly made two drug transactions within five days. During those drug transactions, he learned of the involvement of my client's wife, of Andy Espinoza, of Anthony Palafox, and of Brian Ramirez. So, basically what, in my viewpoint, the detective became frustrated with was, number one, the efficiency of the investigation because when he talks about why they couldn't do certain things like that in other confidential informant, one of the things he says aside from the fact that he says, well, you know, we were concerned that there would be suspicion raised if the confidential sources hung around too long and asked too many questions, and we didn't know whether or not they'd be able to get to the sources of supply. Well, number one, they got at least one source of supply that we know of, Cynthia Martinez. Number two... I have a sentencing question to ask you and you've only got a minute and a half left, so go ahead. I'll stop and I'll answer the sentencing question. What's your best argument for sending this case back for resentencing? What did the district judge do wrong? Well, in my view... I want it with a 600-month sentence. What the district judge did wrong was under 851B, he misapplied the statute and did not make a finding of any facts leading to identity. Leading up to what? Identity. He was required... The prosecution was required to prove two things. The prosecution was required to prove that my client was the person who had the prior conviction and that the prior conviction was for a felony drug offense that qualified for the enhancement. And the prosecutor seems to imply that I waived that argument, but what I submit to the court is that I am not obligated, under the way the statute reads, to answer with a written response challenging identity or the nature of the prior conviction. You filed a response, though, right? I did file a response, but... What was the purpose of the response? The purpose of the response was to make a constitutional argument about the jury trial and to make an argument about whether or not the statute was divisible. So why wouldn't you also raise... I mean, if you didn't believe that he was the Rodriguez who suffered these prior... why wouldn't you add that as an objection? It's not a matter of whether I believe that or not, and that's another area where the judge was wrong, because he forced me, under order, to tell him whether I had a good faith belief whether or not my client was the person contained in the prior complaints and the prior conviction. But suppose there had been a proper colloquy. What's that? So my understanding was your complaint was part of your concern here, or a failure on the part of the district judge, was that he didn't engage in a proper colloquy asking Mr. Rodriguez either to admit or deny. And that is commented on in a case that I cited, U.S. v. Kellum. And the Kellum court, in fact, states, quote, there were at least two other potential deficiencies in the sentencing hearing. First, the court failed to inquire of Kellum whether she affirmed or denied she had previously been convicted of three alleged state drug offenses, which it was obligated to do. So that triggers the response that I have to make. Number two, I don't believe I'm required to make a response unless I am challenging the validity of the prior in terms of it being constitutionally firm. But if the purpose of the statute is to put you on notice so that you could submit something in writing, and you went ahead and submitted something in writing but failed to raise this issue, isn't the purpose of putting you on notice, I mean, you had your opportunity to submit whatever it is you wanted to submit in writing and you didn't include all your arguments. Well, let me say this. I don't have to include all my arguments. I think what Section C says is that, except as otherwise provided by Paragraph 2, the prosecutor should have the burden of proof beyond a reasonable doubt on any issue of fact. Paragraph 2 only requires that the conviction alleging the information was obtained in violation of the Constitution of the United States, which was an issue I did not raise. And that's the only issue that the statute indicates I need to raise. And it goes on to say, any challenge to the prior conviction not raised, response to the information before an increased sentence is imposed shall be waived. And that's referring to what's in Paragraph 2, which is the Constitution. But nonetheless, at the sentencing hearing, the district judge did make a finding. That's correct, but his finding wasn't supported by the evidence. Remember, if I said absolutely nothing, Judge, would the prosecutor still have to prove that they had a conviction and that was my client? Did he prove identity? No. My client's name is not so unusual that one can infer because there's a conviction for an individual. So what was wrong with the findings the judge made? Well, I don't know that the judge made findings other than the fact that he believed that sufficient evidence had been made. So what was wrong with the evidence? Let me put it this way. What was wrong with the evidence that was submitted? There was no evidence to show that my client was a Robert Rodriguez. What did they need to put in the record that they didn't put in the record that would address your concern? In fact, there was some type of evidence in the documentation submitted to the court showing that a photograph, fingerprints, information about my client's place of birth, date of birth, anything like that, and they didn't submit that. The prosecutor, for example, says, well, they have the CII number. Sure, they have the CII number, but there was no evidence submitted to the court that that CII number was my client's, and how could you simply by saying, okay, there's a judge. So what's the remedy? We would send it back for further proceedings? You would either send it back for further proceedings or you would do what I asked. No, you wouldn't send it back. You would reverse it for insufficient evidence. You wouldn't send it back at all. You would say it's not valid, and then you'd send the sentencing back to the court to re-sentence based on not having a minimum mandatory. That would be my viewpoint. Now, if you weren't to find that, I have another position that I've taken based on the Aileen case that we've come to the point now, and I know that the court's reluctant to do this because it doesn't like to overturn Supreme Court precedent, but if you look at the cases We're bound by our own authority also, so, you know, save it for another day. Okay, well, I just want to indicate that Aileen indicates to me that the court is at the point now based on its statements of law that this is a situation where the 851D raises the floor and there should be a jury trial. All right, thank you. Thank you, sir. We'll hear from the government now. Thank you. Can I just ask you on the last point we were discussing? If I understood Mr. Baltax correctly, one of the things he said was that on the identity question, the sentencing, that there are certain things that you argue in your brief in this court that maybe were not presented to the district court on the issue of identity. Is that true? Well, I would say no, but let me explain. This is how it went. As this court knows from 21 U.S.C., we filed the information ahead of trial. He then filed two months before sentencing the written objection. There were only two grounds raised. Both of them were matters of law. One of them was that under the categorical approach, the 11379 priors were not drug-trafficking offenses, and that's the whole Coronado beholder. This court's going to hear this issue, Martinez-Lopez, next January. Pure issue of law. And the second pure issue of law was the Sixth Amendment claim that he just raised, that this should go to a jury. There was zero mention of identity. So when one reads the, and it was the very beginning of the sentencing hearing, they have all this argument. The sentence counsel twice says, well, is the prosecutor done with the evidence? Is the prosecutor done with his evidence? And he says, well, yeah, I think we've covered it. And then suddenly this identity thing has sprung for the first time. And you can tell from the record, even the prosecutor at one point says, well, you know, I didn't see this coming. I'm only responding to what's in the papers. So, you know, of course then we argue that it's waived. Now, to come right to your question again, then what am I faced with on appeal? I don't just like to argue waiver. I say let's look at what's in the record. The arguments that I made on appeal were never presented to the district court, but that's because that issue hadn't been preserved. But all my arguments I make are from the certified records, the face of them, that were given to the judge. Oh, I see. So what you're relying on, so you provided the certified records under A51 to show the prior offenses that were predicate for A51. Correct. But in those very documents that were presented to the district court judge are these identifiers of the individual. So while you didn't stand up before him and say, look at line three of this document and look at this document, it's all there in what he had before him. Correct. All right. And did he then make a specific finding of identity or identification of the defendant, or did he say the argument's waived, or did he say I don't have a problem with this is the guy, or did he force defense counsel to? Well, he does at the end, I believe. He makes a finding. Well, I think it's an excerpt of record 374. I'll find that the government has in fact met their burden. And I thought, you know, at some point he does, because from excerpts of record 361 to 74, this goes on for 13 pages. You have this back and forth. But then he says, I found the government met their burden. So we would submit. But, again, you know, I come in front of you here. This is obviously a significant sentence. We'll get to that in a second, too. But just briefly on this 851, I want the court to be assured then, you know, yeah, Robert Rodriguez, sure, it's a common name. But every one of the charging documents had his middle name. He was born in 1976. The only reason we didn't put the full dates in is because the redaction rules. I mean, so essentially your opponent says we should say essentially we're reversing on this. They haven't met their burden on 851. His alternative ground is you could remand it. But if we remanded it, the outcome is obvious. If we remanded it and said you didn't make a specific finding or the government didn't produce enough evidence, the government would produce enough evidence, and the judge would make a finding, and we'd be right back where we started from, right? Exactly. You don't have any doubt that this is the guy and that you've got evidence this is the guy. Exactly. And as Judge Benitez said, too, you know, yes, we have the burden. We met it. We believe with our documents the judge found as much. It still bears noting that there was no contrary evidence. The case law says, you know, he says, well, we should have had fingerprints. If you look at this case, this court's case in Okafor, it says fingerprints are not required as a rule, and the only time it's ever been suggested is where there's something that the defense claims. Like I was out of the country when you said I had that conviction, or this isn't my name, or this isn't my birthday. You have none of that here. Well, you agree. It may be late, but in the district court, the identity of the person named in the 851 papers was an issue? It was. Once the prosecutor said, yes, I'm done talking about the two things that the defense actually briefed. Yeah. It was. But even, you know, as far as I know. It looks like what happened here is the only thing the judge really didn't do was simply to confront him directly before imposing sentence and ask him if he admitted or denied the documents alleged in the information. That's true. But, you know, a couple points on that. I believe somebody in the court, maybe it was even yourself, Your Honor. I mean, that step is then do you affirm or deny? I deny. Okay, now it's time for you to submit a written. So, you know, he basically, we would say the purpose of that. The only point was that if Judge Benitez had asked him and he said, well, I deny that they relate to me, then under the statute he would have had to come forward with some evidence or whatever, his own. We would have filed a written response and specified. And then the court would have conducted a hearing on identity. My other argument, too, though, is that excerpt of Record 368. I know defense counsel had an issue with this, but, you know, at some point during this hearing on 851, the court says, well, do you have a good faith basis? And I don't know that the statute, it has to be the defense himself. The defendant is obviously bound by the statements of his client. I mean, this isn't about gamesmanship. The whole point of using these resources is like, look, you got this information. Do you have a good faith basis? And, you know, to his credit, he eventually says, no, I have no issue that I think these are my clients. So I would say any reasonable district judge faced with that kind of record, there was no necessity to do anything. Look, it happens all the time in sentencing where the probation officer says, I talked to the probation officer in another jurisdiction and they said X. Defense counsel gets up and says, well, that wasn't my client. Then we say, okay, a phone call is not enough. Go get a certified record. If the issue is legitimately raised, sufficient to raise some sort of a question. And in this case, I don't see it. Exactly. Do you want to address the affidavit for the wiretap? Yes. The necessity and the overall factual presentation that was laid out in the affidavit. As this court is aware, the necessity requirement is two parts. And it's a bifurcated standard of review. You have the full and complete statement. That gets de novo review. And then you have the actual finding of necessity, which is very deferential. And that's under abuse of discretion. Turning to the first requirement, there is one claim and one claim only that this fourth waiver, Mr. Andres does not put forth as a basis for search. But to that, we would say a few things. First of all, again, the black letter law of this circuit is that you don't need to exhaust every possible technique. So the fact that one is just one of the issue should already give this court pause. Second, while it's undisputed that that waiver wasn't put in the affidavit, the affidavit did talk about the practicality of searches. It said specifically, and as you pointed out, this was sort of a two-prong investigation. It wasn't just drug trafficking. It was also extortion. What Detective McKean specifically averred was, and this was in excerpts of record 161 to 62, that was in the first affidavit, and pages 218 to 219 of the second, he said the most critical evidence isn't even susceptible to search here. When people give threats, I guess the implication is they do it verbally. It's not like when the Mexican mafia is shaking down gangs, they send out an email or they keep a record of it. And so his whole point was that it's just not a tool that would be very practical, practicable. And the other thing is, even though he didn't specifically say fourth waiver, he did have a category in both affidavits about search, and he did specifically talk about search warrant. And the point I tried to make is this is basically the same result from two different grounds. Even if he doesn't talk about the fourth waiver, he's basically saying a search warrant wouldn't have been any good. And there was probable cause and stage in this case. In fact, notwithstanding the first issue that's raised on appeal, the defense expressly withdrew any objections to probable cause below. But then finally, as Judge Pires, you also pointed out, if one just steps back and looks at this, is this really material fact? I mean, even if fourth waiver searches are very broad under state law, there's still an outer limit that they can't just be done every day, then it amounts to harassment. The minute you do one search, you're putting the subject on notice. What were we supposed to do? Stop him on the street five days in a row? That's not going to advance the purposes. But again, under this first full and complete statements of facts, that's 2518 sub 1 sub c, it has to be material. And we would submit that this record fulfills that burden, especially based on the point I made at the beginning, which is that you don't have to exhaust every conceivable technique. Now, as far as the necessity determination itself, and again, when we shifted this, and this is 2518 sub 3 sub c, now it gets very deferential. And this Court takes a common-sense approach. We would submit, and if this Court looks at the record, it excerpts the record 266 to 92, that's 25 pages of argument that Judge Venita's entertained about this issue. You said it gets very deferential. We looked de novo at what the issuing judge did, right? My understanding is only on the claim that goes to full and complete statement under 2518 1 c, but for the actual finding under sub 3 sub c that that is deferential. And here in this case, as we pointed out, both of the affidavits, it's not like they gave alternative short shrift. Each of them goes through ten separate categories, and, you know, my opponent, he made good arguments, the same arguments up here that he made in the court below, and Judge Venita's entertained all of them. So what he's basically saying is that because these officers were able to conduct three controlled buys with an informant, they were having success, therefore why did they jump the gun to the wiretap? Well, the government has a few responses now. First of all, as this court is also aware, it's federal law that some success doesn't obviate the need for a wiretap. In fact, otherwise the government's between a rock and a hard place. If we do nothing and try nothing, that's bad. But then now suddenly if we try something and we make some progress, that's bad too. That can't be what it is. What these officers did here, and, you know, it's laborious to go through all ten categories. I won't. I'll pick a few. The informant, that was confidential source one. One of the biggest points, and I know in the reply brief, the defense seems to indicate that I don't have enough Robert Rodriguez-specific arguments. What we pointed out was that controlled or confidential source had to be decommissioned for unsanctioned criminal activity. Besides that, the officer, or the appian indicated that, you know, this isn't a Ponzi scheme. This isn't just a run-of-the-mill conspiracy. This is the Mexican mafia, and based on his many years of experience, a hyper-violent organization. Very insular. Not all of it, but a great majority of its street gang members, he specifically averred this, they tend to grow up in the same neighborhoods, and that's why just putting in an outsider is very difficult. He also said that the highest-ranking people are in custody or have had significant criminal history. An undercover agent, which is another category, you can't generate a criminal history for that. That wouldn't be disproved by the big network that the Mexican mafia has in all of its prisons. That was a specific affidavit, or a specific representation in the affidavit. And even beyond that, aside from the informants, aside from the undercover officers, I mean, another point I'm seeing here, an excerpt of Record 153, he says, undercover officers cannot be involved in the actual distribution of drugs. So that's a very strong limit on that particular tool. Various forms of surveillance. This defendant lived in an apartment. You couldn't put a poll camera. You have that actual representation in excerpt of Record 153. Another place the affidavit says, well, since it's an apartment, even if we try to do surveillance, as this court knows, there's plenty of apartments, hundreds of people come to any given building at any time. If you set up a camera, there's no way of knowing who the different people are. So let me ask you, putting aside, because your time is almost up, but I want to ask you, you know, he got a, what was it, 600 months? Right. And one of the sentencing arguments here is that it was just substantive mandates. I mean, the government didn't even ask for it. It asked for four years less, yes. But still. I agree. The probation officer recommended 360, I think it was. Right. No question is serious. I haven't seen a sentence like this in a long time. If I might, Your Honor, and I know I don't have much time. So tell me, why is this not substantively unreasonable? I mean, aside from the usual intro, you know, I'm about to say it's abuse of discretion. Right. Here you have the scope of the drug trafficking was vast. I think that's exactly what the district court said. So we're talking about not just the one or two-time event. It spans an entire year. Spring 2012 to spring 2013. The testimony was that pounds upon pounds upon pounds of methamphetamine are coming in. As we all know, this isn't marijuana. This isn't something else. Methamphetamine, the court makes points, may be the most destructive drug out there. It ruins homes. It ruins lives. So aside from the vast scope, it's going on for years, or a year, pounds upon pounds, most destructive drugs. Now let's focus in on this defendant. This wasn't his first rodeo. These three convictions in this case were his, I believe, fifth, sixth, and seventh drug convictions. So you might say, well, maybe some of those priors were a simple possession. They're not. This is incorrigible recidivism, Your Honor. 1998, 2002, 2003, 2006. All California convictions of possessions for sale, every single one of them. Now we get into deterrence. Judge Benitez pointed this out, too. In a way, he got coddled by the state. He got maybe 16 to 24-month terms at most for those four trafficking priors that were all within a 10-year period. He doesn't respond to leniency. If he just continues to get on it, I believe the prosecutor made an argument, it's almost like a revolving door, he gets convicted. He goes to prison. He comes out. He keeps selling methamphetamine. That's the drugs, and I am almost done. There were issues with violence. This is the other half of it. This was a validated associate of the Mexican mafia. He was a documented member of the Thunder Hill Street Gang. He beat his wife to the point of hospitalization during the course of this. There's a reference to that in Supplemental Excerpt of Record 318, and on top of it, 1994, assault with a deadly weapon, 2000, conviction for battery, 2006, a conviction for resisting an officer. All that said, Your Honor, yes, this is obviously a very high sentence. But if discretion that Booker was to impute to district judges is to mean anything, and this isn't very common, nor should it be, this should still be a situation that gets that kind of respect. And I believe there's a quote in one of the cases I cite, this court can't reverse, even if you are certain that had you been wearing the district court's robe, you would have sentenced differently. All I can tell you is this sentencing hearing, it spans 48 pages. This was not a flip decision. He addressed all three arguments, or he addressed all the arguments, particularly about the mitigated factors from the childhood, just when he's heard all that. And I think maybe the most corny thing he said was, well, you know what, this is very tragic. You were exposed to drugs at a young age, and guess what, somebody had to give you those drugs. Now you've become that menace to society with these repeated trafficking convictions. So it's tragic, it's sad. But he's going to be 88 or 90 years old by the time he's likely to be out of prison. It's a menace to society, Your Honor, that's all I can say. All right. I appreciate the court's indulgence, particularly this was a long day on a Friday. Okay, yeah. All right. I'll give you a minute or two for rebuttal. The first comment I want to make is this comes from the court's bench book on standards. Whether other investigative procedures have been exhausted or why they reasonably appear likely, not likely to succeed, is reviewed de novo. It's not a deferential standard. The court's decision to deny a motion to suppress a wiretap is reviewed de novo as well. And the facts on that are U.S. v. Lynch, 367, Fed 3rd, 1148, 1149. And the second about the denial of a motion to suppress a wiretap is reviewed de novo, is the Lynch case as well as United States v. Rainier, 218, Fed 3rd, 1108, 1110. That's a Ninth Circuit case. I just want to make one comment about the situation which I believe, Your Honor, is missing because you're saying, oh, you know, we have a sentencing issue and there's issues of whether it's the defendant or not. And the defendant says, no, it's not me, and the probation can call up. This is a sentencing trial or mini trial. It is a bench trial. It requires the prosecution to have the burden of proof and does not permit the informality of saying, okay, Mr. Boltex, you have a good faith belief. If the prosecution — But isn't that the purpose of H.S.B. 1B, that you have to make a written objection? No. Which you didn't make? Well, what is the purpose of that statute? The purpose of that statute is to require a written objection if you are making a constitutional challenge to the prior rule of law. It doesn't say it confines to constitutional challenges. It says to — in B and T of H.S.B. 1, that is what it indicates, Your Honor. It indicates that. And if I could try to read to the court a little bit. It says, the United States attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact. At the request of eye of the party, the court shall enter findings and conclusions of law. And so it basically goes on to say, a person claiming that a conviction alleged in the information was obtained in violation of the Constitution, shall set forth his claim in the factual basis, therefore — That's not the I.D. section. We're talking about — There is no I.D. section. That's a claim that the conviction is unconstitutional. Not that he's not the one who was convicted. Section C deals with written response, which is required. And what it says, except as provided in paragraph 2. Paragraph 2 indicates the only time a written response is required is when you're making a constitutional challenge. And I would ask the court to take a close look at the statute when it's making its decision. Because when it goes on in C, it says, a person claiming a conviction alleged in the information was obtained in violation of the Constitution of the United States, shall set forth his claim in the factual basis, therefore, with particularity in his response to the information. But you're quoting from C2. C1 says, if the person denies any allegation of the information of prior conviction or claims — Oh, I see. But then it says, except as provided in paragraph 2. And so that's the problem I have here. And the problem I have with the court saying to me, Mr. Bultak, do you have a good faith belief? Can you imagine if I was in a jury trial and the judge looked at me in front of the jury and said, do you have a good faith belief that your client didn't commit this crime, Mr. Bultak? And then allow the jury to take that as evidence as to whether my client committed the crime. And then the court's allowed to take my statement that, no, I don't. I'm allowed to sit there and wait and see whether the prosecution meets its burden. And I know that it may be distasteful under this circumstance for me to have done so. The whole statutory scheme in one piece. I'll take note of what you just — I understand what you're saying. Okay. Do you have any — You want me to comment on the 600 months? You can comment on it, and then we're going to end. Okay. Just briefly, Ron, I think, first of all, one of the problems I had with Judge Benitez was he made a statement that in all of these methamphetamine cases, he gives harsh sentences. He's supposed to look at the particular circumstances of the defendant. My client is tragic. He's raised in a situation of violence. He's raised in a situation where he takes drugs when he's less than a teenager, when he's between the ages of five and ten when he starts using it, and he starts using meth as a teenager. He does not consider these as mitigating factors. And the final comment is the court needs to look at this sentence in relation to two things. Number one, in relation to what sentence he has longest received in terms of considering its punitive value, and number two, the court needs to consider the proportionality. Laura Cruz was the number one defendant. She was running Mr. Rodriguez's operations purportedly when he was incarcerated. She got a 120-month sentence. Travis Jobs, who was doing an incredible amount of packaging and manufacturing methamphetamine, he got 30 years, and I think that 50 years is disproportionate in that regard. I want to point out, lastly, that in the 2015 Federal Sentencing Commission report on life sentences, they talk about de facto life sentences. My client has received a de facto life sentence, the reason being the average age, as indicated on page 17 of that report, for a federal inmate is 66 years old if they're incarcerated. That's their age of death. So, basically, my client has been sentenced to life. Thank you, Ron. With that, thank you, counsel, and the matter is submitted, and we'll close the session for the day and the week.
judges: Tashima, Paez, Friedman